Alright, the next case is scheduled for oral argument. It's the case of Nancy Morris v. Andrew Bland. Attorneys notified of argument for today were Mr. Cargan representing the appellant and Mr. Staley representing the appellee. Mr. Cargan is not here. I have in my hands the notification and the acknowledgement that he sent in to our clerk of court acknowledging receipt of notification that oral argument would be held today here in Richmond. My understanding from the clerk is that when he did not appear this morning he was contacted and has no valid excuse for why he is not here. And so what I would propose to do is go forward in his absence given the fact that he was notified that the argument would be today. So Mr. Staley that means that Mr. Cargan not being present you will be the only one making an argument and we will be happy to hear what you have to say. There is a certain amount of pressure. There is no doubt about that. No doubt about that. I would like to start just factually as you are well aware this case stems from evidentiary rulings that Judge Gergel made in Charleston, South Carolina. We tried a week long trial on delivered indifference, named five different officers, three officers and two sergeants. You represented the plaintiff? I did, your honor. Okay, so Mr. Cargan. He objected to numerous evidentiary rulings that Judge Gergel made. I would like to start a little bit out of order on section four. He argues that Judge Gergel prohibited him from cross-examining our qualified expert in the treating physicians. And I want to start there because in our brief the part that I feel like is probably the most inadequate explaining why it shouldn't be granted is that section. If you look at the record on page, the joint appendix that starts on page 378 and 379, the only witness that Mr. Cargan was going to be allowed to cross-examination, cross-examine, was Dr. Rayba who was our expert that we listed, provided a report for, and was calling. There is a discussion at that point, your honor, on 378 and 379 about the scope of that cross-examination. When the judge learned that we did not intend to introduce any evidence whatsoever for life expectancy or loss earnings, any type of economics because quite frankly our client didn't have any. At that point, there was a discussion ensued about whether he'd be allowed to go into those areas. Mr. Cargan on the record when speaking with the judge even conceded, well, your honor, if he doesn't open the door and go into life expectancy, we don't have an issue. We didn't and there's no issue there. So I take exception when he argues that he was barred from cross-examining the expert only towards scope and the judge and him had a meeting of the minds that that wouldn't be appropriate. Then if you go on and read, Mr. Cargan is kind of mixing up what actually transpired. There's a discussion the judge, Judge Gergel, asked Mr. Cargan, who are you calling as an expert? And he names Dr. Reimer who is a pathologist and he names Dr. Sanders who was a treating physician in the emergency room when David Woods was admitted for treatment. There was some confusion at that part whether or not, I think Mr. Cargan just misstated, he wasn't calling him as his expert. He was calling him as a fact witness that happened to have expertise. We weren't objecting to any of that. The records were very clear what their opinions would be. They have a long discussion about that and when the judge figures, oh, well, you're calling him as a fact witness, Mr. Cargan goes on in the record to explain why he's calling him, how he intends on questioning him, and the judge goes, I have no problem with any of that. So I take exception with this argument that he was prohibited from crossing and calling these people. He was allowed to do both. And I would point out his cross-examination lasted almost 77 pages. There was only one objection that was sustained. And I objected because he was arguing with the witness and that was sustained. Everything else, everything he wanted to ask him came in. Mr. Staley, I do not at all mean to co-opt your argument, but it might be helpful for you to know that I have a couple of questions. Yes, ma'am. If you would care to address them. Certainly. The million-dollar punitive damages award against Burkholder and Garrett is significant. And it seemed to me on reading the record that Garrett was perhaps the less culpable of the two. I'm asking for you to help me with this. So if you could explain, if you could help me understand that. And the second question that I would like to ask you to address, please, is the set-off issue. Certainly. Your Honor, they were not excessive when you look at the opportunities that each of these people had to make a difference. And I can argue on both of them as far as Garrett is more culpable. Garrett's called at 10.30 p.m. You know, Mr. Corrigan states in his brief that only one person, Officer Brophy, even recognized he had a problem. That's not true. What the facts show is at 10.30, a tower guard called Sergeant Garrett and said, we have an inmate on the floor shaking that needs attention. Sergeant Garrett responded, perceived enough of a risk to say, we need to put you in observation. And they did so. Within 10 minutes of being in the observation cell, a man that had no constitutional obligation whatsoever to Mr. Wood, Freeman Ingram, his cellmate, you can see a video clip that we submitted where Mr. Ingram is helping this man sit down, helping this man get some water, and then immediately starts buzzing the front desk. Well, Sergeant Garrett is on duty at this time. And Sergeant Garrett testifies under oath that she goes down and has a conversation where she is told, look, I think we saw blood. Mr. Ingram is explaining to Sergeant Garrett, I think we've seen blood in his stool. There's something wrong here. And she goes, you need to show me. Sergeant Garrett then, Your Honor, goes on to tell another sergeant, look, David Woods, you might want to call the nurse. She comes back on duty, learns that he's been lying in his own feces. And I will tell you, if you look at these video clips, it's the most disturbing things in my 17 years of practice in law that I've witnessed. This is Sergeant Garrett to watch. And Sergeant Garrett ignoring that. And if you look on page 7 of our brief, Your Honor, you can see all the different opportunities these sergeants had to make a difference. Mr. Corrigan likes to say it's just out of whack. Actually, what this jury did was almost surgical precision. When you look at the actual interactions these people had, they were held more responsible because they had more opportunities and should have acted and failed to do that. In regards to Sergeant Burkle, quite frankly, you know, what can never show up in an appeal is – I actually didn't have a question. But I do. Okay. You don't mind. I do. I do. Because I'm curious as to what your justification is for why punitive damage is so much higher for those two. Right. And in answering that, again, it goes to the opportunity they had to make a difference. The sergeant's uncontested testimony was that they were the people that had the authority to call. Burkholder testifies – he's told by Sergeant Garrett, acknowledges, look, you may need to call the nurse. He actually testified that he went down to his cell and Mr. Woods was in his cell like a kid at recess. And, you know, Mr. Corrigan makes a lot saying don't look at the video clips. I want you all to be aware that all 21 came in without any objection whatsoever. And why those clips were important is because they showed a timeline. So here you have an officer going, I went down and checked on him and he was fine like a kid at recess. And when you look at the video, Judge Gergel's right. Honestly, I think the jury just disregarded and didn't believe him at all. But his attitude on the stand was so flippant. Then he's told, you know, he doesn't follow up on it. And on top of that, Burkholder's given a report by James Brophy. James Brophy was initially named. But what did Brophy do? And then immediately fills out an incident report for Sergeant Burkholder so that he would get medical help. And Burkholder fails to act on that. So, you know, and Mr. Corrigan likes to point out, well, the only reason Mr. Brophy knew that was because he was a fireman before. But that's a point that officer, when he was asked that on the stand, he goes, that's absolutely not true. But I knew to do something because I could tell the man was sick. They should finish answering, Judge. Yes, ma'am. And so what I would point to is on page 7, just looking at the reason the verdict, the punitive was larger for both of those people, was exactly consistent with the opportunities they had to change. Now, he argues, and just to follow up on that, Judge, to put this issue to bed, he argues vicarious liability. The only way that they can get there is because vicarious liability. In fairness to Mr. Corrigan, one question in the entire trial came out that Jimmy Stuckey, the lawyer in Charleston, objected to on vicarious liability, and the judge corrected it immediately. He instructed the jury at that time, I want to be sure that you understand there is no vicarious liability. He's responsible for his acts and his acts alone. He's a very detailed, curative instruction at that point, one time. He also gives a charge on vicarious liability, Your Honor. So I would submit to you that any vicarious liability is harmless error that was corrected by the judge at that time. Judge Duncan, I apologize. You asked me two questions when we began. The set-off. The set-off with the Hope defendant. Right. We ended up settling. This case was over a 30-day period. 28 days were in regards to a nurse and a doctor that were on call or on staff. The doctor came in once a week. The nurse was there from basically 9 to 5 Monday through Friday. We settled with the medical for their negligence, gross negligence that occurred before that Friday for 625. We split those right down the middle. 312.5 went to survival. 312.5 went to wrongful death. In a settlement agreement? Through a settlement agreement, Your Honor, that was approved by Judge Garbo. What he did at that hearing, Mr. Corrigan wanted a complete cite. He said, we're going to wait to deal with that if there's a verdict at a later time. What the judge did is he said, look, the wrongful death they got 100% offset for. I argued that I didn't think they were entitled to any offset on the survival because all the jury heard was three days' worth of testimony. They weren't awarding any damages for anything that occurred before Friday. All they heard were damages that this man suffered at their hands. But Judge Garbo told me that didn't make a lot of sense, and he came up with another formula. What he did was he broke it down and gave them a percentage for all the days but said, listen, the last three days, it's obvious, you can even see on the video, this man's suffering was increasing and getting worse. I can tell it was from the video that it was different from the days that weren't on video. That's a good, you can't. But I will submit to you that, and I can't even answer that because we don't have, in all candor, I don't have video because he wasn't moved to observation. He wasn't even in prison. He was in general population. But, Judge, one of the arguments he brought up, which is kind of closely related to this, was the exclusion of all that evidence, you know, exclusion of the Hope Clinic. We don't have video before. So I can't state here and say I know for certain he wasn't displaying. But if you watch what I do know from Friday when he first is put into observation to when he leaves, you can see this man's condition deteriorates considerably. Well, he was in pretty bad shape when the video showed. He was. And on Monday morning when he actually was admitted to the ER, he had a hemoglobin of four. And so he was in really, really bad shape. But what the judge did, Your Honor, it's certainly logical how he approached it. He didn't abuse his discretion or use some – And he only offset a portion of the survival. That's right. He gave him, I think it was 171. It ended up being 171,875 in compensatory damages. That was split evenly between all the defendants. So they did get credit even for some of the pain and suffering, which, again, you know, that's not on appeal or before you. But I felt like the judge was more than fair in doing that, was more than fair. And he came up with a legitimate reason for doing so. I'm kind of off track. Is there anything else that concerns you that you – because I've addressed, I think, the major thing. I was going to tackle the set-off and punitives next. So if there's anything else, I'll be more than happy to answer that. I think we understand your position. Okay. Thank you, Your Honor. I just want to state for the record, it was a real honor to be here. It was on my bucket list, and I can now check it off. Is that why you don't ever want to come back? No, I'd love to come back. You know, maybe next time I'll actually have opposition. Do you want to keep going? Okay. We'll come down and greet half the council here. Go on to the next case.
judges: William B. Traxler Jr., Allyson K. Duncan, Andre M. Davis